

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-12-00122-CV

| | | |
|---|---|---|
| Clinton Brunson, M.D. | § | From the 48th District Court |
| | § | of Tarrant County (48-253022-11) |
| v. | | |
| | § | January 17, 2013 |
| Ellvan Johnston | § | Opinion by Justice Gardner |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's order. It is ordered that the order of the trial court is affirmed.

It is further ordered that appellant Clinton Brunson, M.D. shall pay all costs of this appeal, for which let execution issue.

SECOND DISTRICT COURT OF APPEALS


By_____
Justice Anne Gardner



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00122-CV

CLINTON BRUNSON, M.D.          APPELLANT

V.

ELLVAN JOHNSTON          APPELLEE

----------

## FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In this interlocutory appeal,[2] Appellant Clinton Brunson, M.D. contends that the trial court abused its discretion by denying his motion to dismiss the healthcare liability claim filed against him by Appellee Ellvan Johnston. Dr. Brunson asserts in one issue that the expert report by Dr. Gary Lustgarten does

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9) (West Supp. 2012).

not establish Dr. Lustgarten's qualifications to address the applicable standard of care or breach of the standard of care and that the expert reports by Dr. Lustgarten and Dr. Philip Shalen do not adequately set forth the required element of proximate cause. We affirm.

## II. Background

Johnston filed this lawsuit against Dr. Brunson and three other defendants in May 2011. Johnston alleged in his original petition that he was admitted to Presbyterian Hospital of Rockwall on June 8, 2009. The next day, Johnston could not move his left leg. Although Johnston was later able to move his leg, he underwent an MRI on June 9, and Dr. Brunson carried out and interpreted the MRI scan and dictated a report. In the report, Dr. Brunson did not identify any abnormalities in Johnston's spinal cord.

Dr. Michael Musacchio, a neurosurgeon, evaluated Johnston on June 11 because of Johnston's report of pain in his right hip and tail bone and difficulty in moving his leg. Dr. Musacchio also reviewed the June 9 MRI scan and likewise found no abnormalities, but he recommended that Johnston be evaluated by a pain management doctor. Dr. Amit Darnule evaluated Johnston on June 12 but also did not identify abnormalities on Johnston's June 9 MRI scan.

On June 13, Johnston exhibited escalating neurologic injuries in both lower extremities. He was unable to move either of his legs by June 14. Dr. Ahmed Elsehety was consulted and "identified findings suggestive of damage to [Johnston's] spinal cord at L1" and "abnormalities between T9 and the top of L1."

3

Johnston was transferred to the University of Texas Southwest Zale Lipshy Hospital on June 18 and underwent surgery on June 19. At the time of surgery, "there was a spinal cord intradural hematoma from T9 to L2." Johnston alleged that Dr. Brunson was negligent by failing "to reasonably identify abnormalities in the MRI scan of June 9, 2009 in the L1 T12 region of the spinal cord" and by failing to "provide reasonable treatment for those abnormalities."

Johnston served an expert report and curriculum vitae by Dr. Lustgarten along with his original petition, and he subsequently served expert reports by Neal H. Blauzvern, D.O. and Philip R. Shalen, M.D. Dr. Brunson filed objections to the reports by Drs. Lustgarten and Shalen. The trial court overruled Dr. Brunson's objections after a hearing, and this interlocutory appeal followed.

### III. Standard of Review and Statutory Requirements

A trial court's ruling concerning an expert report under civil practice and remedies code section 74.351 is reviewable under the abuse of discretion standard. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West 2011); *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have

4

ruled differently in the same circumstances. *Bowie Mem'l*, 79 S.W.3d at 52; *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

A health care liability claimant must serve an expert report on each defendant no later than the 120th day after the claim is filed. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). A defendant may challenge the adequacy of a report by filing a motion to dismiss, and the trial court must grant the motion to dismiss if it finds after a hearing that "the report does not represent an objective good faith effort to comply with the definition of an expert report" in the statute. *Id*. § 74.351(l). While the expert report "need not marshal all [of] the plaintiff's proof," *Palacios*, 46 S.W.3d at 878 (construing former article 4590i, § 13.01), it must provide a fair summary of the expert's opinions as to the "applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6).

To constitute a good faith effort, the report must discuss the standards of care, breach, and causation with sufficient specificity (1) to inform the defendant of the conduct the plaintiff has called into question and (2) to provide the trial court with a basis to conclude that the claims have merit. *See Bowie Mem'l*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 879. A report does not fulfill this requirement if it merely states the expert's conclusions or if it omits any of the statutory requirements. *Bowie Mem'l*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at

879. But the information in the report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios*, 46 S.W.3d at 879.

When reviewing the adequacy of a report, the only information relevant to the inquiry is the information contained within the four corners of the document. *Bowie Mem'l*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878. This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *See Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.). However, section 74.351 does not prohibit experts, as opposed to courts, from making inferences based on medical history. *Marvin v. Fithian*, No. 14-07-00996-CV, 2008 WL 2579824, at *4 (Tex. App.—Houston [14th Dist.] July 1, 2008, no pet.) (mem. op.); *see also* Tex. R. Evid. 703 (providing that an expert may draw inferences from the facts or data in a particular case); Tex. R. Evid. 705 (providing that an expert may testify in terms of opinions and inferences).

## IV. Expert Qualifications

Dr. Brunson argues in the first part of his sole issue that Dr. Lustgarten's expert report and attached CV do not establish his qualifications to address the applicable standard of care or breach of the standard of care.

To be qualified, an expert must satisfy the requirements of section 74.401. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(A). Under section 74.401, the expert must be a physician who:

6

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

*Id.* § 74.401(a) (West 2011).

Dr. Lustgarten's expert report contains the following:

My qualifications to render opinions as an expert witness . . . in this case are set out on my CV which [is] attached. In pertinent part I am a board certified neurological surgeon. I graduated from State University of Iowa College of Medicine in 1965. I served my internship at the New York Hospital/Cornell Medical Center in New York City in 1965 through 1966. I was flight surgeon for the United States Air [F]orce between 1966 and 1968. In 1968 I was accepted as a neurosurgical resident at the University of Miami-Jackson Memorial Hospital School of Medicine, Miami, Florida. I completed my residency in 1973 and I've been in private practice of neurosurgery since 1976. I have been Board Certified [i]n neurological surgeries since 1976.

. . . .

As a neurosurgeon through my training, experience and education I have been thoroughly exposed to neuroradiology as it pertains to interpretation of lumbar MRI scans of the type performed on Mr. Johnston in this case on June 9, 2009. . . . Interpretation of a lumbar spine MRI is a skill that both a radiologist and a neurosurgeon are expected to be able to perform with competence and accuracy to the degree with which is necessary to identify the lesion at the T-12 through L-1 region as identified on this scan.

As such, I am qualified to express an opinion as to whether or not Dr. Brunson met the standard of care in interpretation of the film performed on Mr. Johnston on June 9, 2009. I am familiar with the standard of care for Dr. Brunson and the circumstances because both radiologist[s] like Dr. Brunson and neurosurgeons like myself

7

have the responsibility to accurately and competently interpret films of this type.

In addition to listing various honors and awards that Dr. Lustgarten has received, his CV states that he has been licensed in Florida from "1970 – Present," that he has been licensed in Maine from "2000 – Present," and that he has served as a "Florida Worker's Compensation Certified Physician Expert Medical Advisor (Examiner) – 'EMA'" from "08/05/95 – Present." The CV also states that Dr. Lustgarten is or was a "Senior Attending" at Jackson North Medical Center, but the CV does not include a date-range or clarify whether that is a position Dr. Lustgarten held in either 2009 or 2011.

Dr. Brunson contends that Dr. Lustgarten is not qualified to offer opinions as to the standard of care and breach of the standard of care because his expert report and CV do not establish on their face that he "was actively practicing medicine in rendering medical care services relevant to [Johnston]'s claim, either at the time the claim arose [in 2009], or at the time he rendered the opinion in his report [in 2011]." Dr. Brunson further argues that although Dr. Lustgarten's report states that he has "been in [the] private practice of neurosurgery since 1976," the only employment listed during 2009 or 2011 is "Expert Medical Advisor." Dr. Brunson argues that other statements in Dr. Lustgarten's report are conclusory and are therefore insufficient to establish his qualifications. In his reply brief, Dr. Brunson asserts that the statements that Dr. Lustgarten "has been" board certified in neurological surgeries and in the "private practice of

8

neurosurgery" since 1976 and that Dr. Lustgarten has been licensed in Florida from 1970 to the present and Maine from 2000 to the present do not establish that Dr. Lustgarten was actively practicing medicine in 2009 or 2011.

We decline to read Dr. Lustgarten's CV and report so narrowly. Dr. Lustgarten's report and CV expressly provide that he serves as a Florida Worker's Compensation Certified Physician Expert Medical Advisor and that he has been licensed, board certified, and in the private practice of neurosurgery from 1976 to the present. As to whether Dr. Lustgarten, a neurosurgeon, is qualified to address the standard of care and alleged breach by Dr. Brunson, a radiologist, Dr. Lustgarten's report provides that he has been "thoroughly exposed" to neuroradiology through his years of practice and that the interpretation of an MRI scan like that involved in this case is common to both neurosurgery and radiology. We hold that, considered together in their entirety, Dr. Lustgarten's report and CV establish his qualifications to render opinions in this case as to the applicable standard of care and alleged breach of the standard of care by Dr. Brunson. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a)(1) (expert must be "practicing medicine" at time of testimony or at time claim arose); *see also Moore v. Gatica*, 269 S.W.3d 134, 140–41 (Tex. App.—Fort Worth 2008, pet. denied) (stating that certain standards of medical care "apply to multiple schools of practice and any medical doctor" and that a physician of another school of practice may be "competent to testify if he has practical knowledge of what is usually and customarily done by a practitioner

9

under circumstances similar to those confronting the defendant"). We overrule this part of Dr. Brunson's sole issue.

## V. Proximate Cause

In the remainder of his sole issue, Dr. Brunson contends that the expert reports by "Drs. Lustgarten and Shalen, taken together or separately, are legally insufficient" because they include only conclusory and speculative statements of proximate causation.

The purpose of the expert report requirement is to inform the defendant of the specific conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 879. A report that merely states the expert's conclusions about causation does not fulfill these purposes. *Id.* Rather, the expert must explain the basis of his statements to link his conclusions to the facts. *Bowie Mem'l*, 79 S.W.3d at 52.

A plaintiff may meet the requirements of chapter 74 through multiple reports. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(i). A single report need not "address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider." *Id.* But read together, the reports must provide a "fair summary" of the experts' opinions. *Id.* § 74.351(r)(6); *Barber v. Mercer*, 303 S.W.3d 786, 791 (Tex. App.—Fort Worth 2009, no pet.).

Relevant to proximate cause, Dr. Lustgarten's report states as follows:

10

On June 9, 2009[,] Dr. Brunson breached the standard of care when he interpreted this film but failed to identify the lesion at T-12 and L-1. Dr. Brunson further failed to meet the standard of care in fa[i]ling to identify the lesion, recommend follow-up imaging including MRI scans of the thoracic and lumbar spine with and without contrast and to make recommendation and/or direct referral to a neurosurgeon to address the lesion. It would have been acceptable in these circumstances to either contact the patient's admitting physician or if that could not be accomplished immediately arranging emergency consultation with a neurosurgeon for evaluation for surgery for removal of and/or exploration of the lumbar and thoracic spine.

It is well understood and documented in medicine that emergency decompression of the spine must be accomplished within 12 hours of the onset of symptom. If emergency decompression of the spine is performed on those patients who have hematoma in their spinal canal within the first 12 hours of symptoms more likely than not such decompression will result in restoration of neurologic function and stabilization of the patient to such a degree that they will no longer be paraplegic.

. . . Mr. Johnston's case records demonstrate that after the episode in which he was experiencing loss of neurologic function to the left leg he had an episode of almost complete resolution. It was not until June 12, 2009 that he suffered findings consistent with paraplegia that became permanent. If Dr. Brunson had met the standard of care then Mr. Johnston would have undergone emergency decompression of the spine prior to the onset of permanent paraplegia three days later on June 12, 2009.

Stated another way, the evolution of Mr. Johnston's symptoms created a circumstance whereby if Dr. Brunson had met the standard of care appropriate surgical intervention could have been performed prior to the onset of the catastrophic damages that occurred with new onset of symptoms on June 12, 2009. . . . This would have afforded Mr. Johnston with an opportunity for definitive surgical correction of his problem and resolution of the mass on his spinal cord before it ever reached the point of causing bilateral lower extremity paralysis and paraplegia.

Dr. Shalen's report includes the following:

11

It is my opinion, based on a reasonable degree of medical certainty that Dr. Brunson failed to meet the reasonable, prudent and accepted standards of medical care for a radiologist in the diagnosis, care and treatment of Mr. El[l]van Johnston by failing to identify an obvious conus medullaris region abnormality visible o[n] the MRI of June 9, 2009. Compression of the conus was evident. Conus compression was most likely secondary to a hematoma. This failure to diagnose a conus abnormality deviates from the standard of care. To comply with the standard of care Dr. Brunson should have: (1) carefully reviewed the images of the MRI that showed the conus medullaris region abnormality; (2) identified those abnormalities and (3) dictated a report describing those abnormalities. This would have allowed a timely recognition of the pathology in Mr. Johnston's spine.

Within reasonable probability, this deviation caused an unreasonable delay in the clinical diagnosis and intervention of his neurological condition. The delay allowed his symptoms to increase to the point of causing permanent neurological injury by ischemia to the spinal cord.

Considered together, the Dr. Lustgarten and Dr. Shalen reports provide that, more likely than not, a patient undergoing emergency decompression of the spine within twelve hours of the onset of symptoms would have neurologic function restored and would no longer be paraplegic; that Johnston showed signs of permanent paraplegia on June 12, three days after Dr. Brunson performed and interpreted the MRI scan; that Dr. Brunson's failure to recognize the spinal condition and recommend or obtain further evaluation or surgical intervention permitted Johnston's condition to worsen "to the point of causing permanent neurological injury"; and that the delay deprived Johnston of the "opportunity for definitive surgical correction of his problem and resolution of the mass on his spinal cord" before it led to paraplegia. In short, the expert reports provide that

12

had Dr. Brunson recognized the spinal abnormality, Johnston would have undergone spinal decompression and had his neurologic function restored but that Johnston did not receive the proper treatment for three days, a time at which his neurologic injury had become permanent.

Dr. Brunson argues that Dr. Lustgarten's and Dr. Shalen's causation opinions merely "provide insight" into what caused Johnston's paralysis but that they do not link Dr. Brunson's alleged breach of the standard of care to Johnston's injuries through specific facts. He further argues that the reports are lacking because the experts leave room to speculate as to whether there would have been time to recognize the pathology of Johnston's spine, whether the other two physicians who evaluated Johnston would have agreed that surgery should go forward, whether Johnston would have in fact undergone surgery, and whether the surgery would have successfully prevented permanent paraplegia. These complaints relate, however, to inferences that expert witnesses are permitted to make. *See Benish v. Grottie*, 281 S.W.3d 184, 195 (Tex. App.—Fort Worth 2009, pet. denied) (contrasting experts' ability to make inferences from facts with prohibition against courts making inferences to determine if statutory expert reports establish that claims have merit) (citing Tex. R. Evid. 703, 705); *see also Weatherford Tex. Hosp. Co. v. Riley*, No. 02-10-00453-CV, 2011 WL 2518920, at *4 (Tex. App.—Fort Worth June 23, 2011, no pet.) (mem. op.) (holding causation opinion in expert report sufficient because expert was

permitted to infer that physician would have performed cesarean section had nurses discussed issues with the physician).

Rather than attempting to create a list of hypothetical scenarios not addressed within the expert reports, the questions we must answer are whether the Dr. Lustgarten and Dr. Shalen reports provide a fair summary of the causal relationship between Dr. Brunson's alleged failure to meet the standard of care and Johnston's injuries and whether the reports adequately inform Dr. Brunson of the specific conduct Johnston has called into question. In that regard, the reports at issue in this case are similar to the report held to be adequate in *Eikenhorst v. Wellbrock*, No. 01-07-00459-CV, 2008 WL 2339735, at \*2–3, 9–11 (Tex. App.—Houston [1st Dist.] June 5, 2008, no pet.) (mem. op.). There, the expert opined that Dr. Eikenhorst's failure to properly diagnose the injury and communicate his CT scan findings caused a delay in treatment and aggravation of the patient's injuries. *Id.* at \*9. The court held that the expert's report "did not only state that a delay in diagnosis caused permanent injuries; it linked Eikenhorst's specific conduct to a delay in diagnosis, leading to increased and prolonged spinal pressure, resulting in [the patient]'s permanent impairment." *Id.* at \*10. In this case, the reports assert that Dr. Brunson failed to recognize the spinal abnormality and failed to arrange further evaluation or surgical intervention for Johnston, the result of which was a delay in treatment that led to permanent paralysis. The reports, while not lengthy, provide sufficient information and are

14

not so conclusory or speculative that they fail to satisfy Johnston's statutory obligations.

We hold that the reports by Dr. Lustgarten and Dr. Shalen gave the trial court a sufficient basis to reasonably conclude that Johnston's claims have merit and advised Dr. Brunson of the conduct Johnston has called into question. *See Palacios*, 46 S.W.3d at 875. We overrule the remainder of Dr. Brunson's sole issue.

## VI. Conclusion

Having overruled Dr. Brunson's sole issue, we affirm the trial court's order.


ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DELIVERED: January 17, 2013

15